IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 17, 2013

## RICHARD C. TAYLOR v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Williamson County**
**No. CR115330      Robbie T. Beal, Judge**

**No. M2012-02365-CCA-R3-PC     Filed - 06/07/2013**

The Petitioner, Richard C. Taylor, pled guilty to first degree premeditated murder and agreed
to a life sentence.  The Petitioner filed a *pro se* petition for post-conviction relief making
several contentions regarding his competency.  The Petitioner then filed a motion requesting
a mental evaluation.  The trial court held a hearing wherein it determined that the Petitioner
had filed his petition beyond the statute of limitations.  The trial court further determined,
however, that the statute of limitations should be tolled if the Petitioner was, in fact,
incompetent. It ordered the Petitioner to provide an affidavit from a treating physician saying
he was incompetent at the time he entered his plea.  The Petitioner failed to so do, and the
trial court summarily dismissed the Petitioner's petition.  On appeal, the Petitioner contends
that the trial court erred when it dismissed his petition because he was mentally incompetent
to enter his guilty plea.  After a thorough review of the record and applicable authorities, we
conclude there exists no error in the judgment of the post-conviction court.  Accordingly, the
judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T.
WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Richard C. Taylor, Henning, Tennessee, pro se.

Robert E. Cooper, Jr., Attorney General and Reporter; Michelle Consiglio-Young, Assistant
Attorney General; Kim Helper, District Attorney General; and Derek Smith, Assistant
District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# I. Facts and Procedural History

This case arises from the Petitioner's killing of a correctional officer in August 1981.

## A. First Trial

At the Petitioner's first trial, it was undisputed that the killer was the Petitioner. *State v. Taylor*, 771 S.W.2d 387, 389 (Tenn. 1989). The issue raised in defense of the murder charge was that the Petitioner was insane at the time of the homicide. *Id.* The Tennessee Supreme Court summarized the facts presented at the Petitioner's first trial as follows:

> The record shows that [the Petitioner] believed that he had been treated unfairly by Officer Moore on several occasions. [The Petitioner] blamed Moore for preventing [the Petitioner] from receiving a stereo and television set left to him by an inmate who had been transferred from the Turney Center. On the day of the killing, Moore reprimanded the [Petitioner] for failing to properly clean the hall. The incident that "set off" [the Petitioner], however, occurred an hour or two before the killing when Moore removed a towel that another inmate, Tony Bedwell, had hung over the window in a cell door to dry and pushed the towel under the door. When Bedwell asked Moore what was going on, Moore explained the regulations against covering the window in the cell door. To Bedwell, the incident was "nothing big," but [the Petitioner], who had seen what happened, advised Bedwell to "kick [Moore] up the side of his head." Bedwell next saw the [Petitioner] when he and Wayne Patterson came to Bedwell's cell to ask if Bedwell had a knife.

> Around 9:00-9:30 p.m., the [Petitioner] approached Moore as he stood talking to some inmates, cursed and asked Moore, "Now what are you going to do, S.O.B.?" [The Petitioner] then grabbed Moore and began to stab him repeatedly with a prison-made knife. Pleading with [the Petitioner] to stop, Moore retreated down the hall. [The Petitioner] continued to hold on to Moore and continued to stab him. Other inmates protested and tried to come to the aid of Moore, but were warned off by [the Petitioner] brandishing his knife.

> After the stabbing, [the Petitioner] returned to his cell block, where he concealed the knife in a closet and changed his clothing. Officer Moore died about forty minutes later in the prison infirmary from internal bleeding caused by a wound that had penetrated his inferior vena cava. He also had suffered

potentially fatal stab wounds to the pancreas and the spleen.

Several inmates described [the Petitioner's] appearance and actions. According to inmate Patterson, the [Petitioner] was "hyper" and nervous. After the killing the [Petitioner] walked around the hallway "in shock," disoriented, bumping into people and the wall. Patterson said [the Petitioner] was shaking and trembling, with an "expression on his face like a wild horse." The officers who apprehended [the Petitioner] after the killing, however, while remarking that he was shaking and stuttering and appeared nervous, said that [the Petitioner] was not confused, was responsive, coherent and understood their questions. [The Petitioner] indicated he understood his rights and signed a waiver but refused to sign a confession or allow his confession to be written down.

The [Petitioner] offered to cooperate if the officers would get his blue jeans and television. When asked why he had stabbed Moore, [the Petitioner] said that he "thought it was his daddy." When asked another time why he had attacked Moore, [The Petitioner] said he had become angry when he had seen Moore pull the towel from Bedwell's door and made up his mind "that that would be the last time he [Moore] would mess with anybody."

The State introduced in evidence several letters the [Petitioner] had written shortly after the killing to friends who were inmates. In them, [the Petitioner] shows an awareness of his actions and explains his motives for the killing. ( E.g.: "It's hard to say why I took Moore's life. Let's just say that I'm not a gopher. There's something I just don't go for."; "I just want you to know that the main thing behind killing that guard was just that, the killing." "Hey, I went in there to see that TBI man and put a crazy act on him. And, hey, my past mental record will put a lot of shit into this game, Rap."; "Hell, I must have stood there with the shank in my hands for about five minutes before Moore looked away. And then I said, 'Wham, now, mother fucker, what are you going to do.' That Moore just looked at me and started running up, up that hall and I . . . was right behind him, then grabbed him by his collar and let out a roar like a lion and was shanking the hell out of him until you run up and got me to stop."; "I told those boys . . . that I did it and I told a couple of guards that I did it, but they ain't got no taped or written statements and that's what counts.")

[The Petitioner], who was twenty-one, had a history of juvenile problems and mental and emotional difficulties that had led to several mental

-3-

evaluations before the killing of Officer Moore. He had been in the drug and alcohol abuse program at the DeBerry Correctional Institute, a state facility for prisoners with psychiatric problems, before coming to the Turney Center. As a result of his having swallowed broken glass, [the Petitioner] was incarcerated in West-100, the section of the main penitentiary in Nashville for prisoners with mental problems, from late May 1981, until July 2, 1981, when he was returned to the Turney Center. [The Petitioner] had been on several anti-psychotic drugs over this period but there was no record of his receiving any medication on the date of the killing.

[The Petitioner's] fellow inmates described him as a loner, moody, and strange. He was characterized as "hyper all the time." One inmate stated, "Richard is a nice guy when he's . . . got his medicine. When he ain't got his medicine, you don't want to mess with him." He had been involved in several incidents of violence toward fellow inmates and the prison staff.

Two attorneys described the [Petitioner's] excited and disoriented manner when they had met him three or more months after the killing. He told them a "breathing voice" (he described as his father's) had told him to stab Moore. He claimed to have a difficult time remembering what occurred on August 19. Chip Burson, coordinator of psychological services at the maximum security ward at the main prison while [the Petitioenr] was there in June 1981, testified that [the Petitioner] had been reclusive, agitated, disoriented, and shaky. He was seen talking to himself in his cell, and Burson had felt he should have been transferred to DeBerry.

After reviewing the [Petitioner's] history and institutional record, defense expert Dr. Michael Stein, a psychologist who had conducted a six-hour clinical interview of and administered two tests to the [Petitioner] on March 30, 1984, diagnosed [the Petitioner] as suffering from borderline personality disorder, paranoid personality disorder and brief reactive psychosis. He opined that at the time of the killing [the Petitioner] was suffering from a psychotic episode as the result of a mental disease or defect and could not therefore appreciate the wrongfulness of his acts or conform his conduct to legal norms. Dr. Stein explained that the letters were the [Petitioner's] attempt to establish an identity as a "macho convict criminal type" to compensate for the weak sense of identity common to borderline personalities. On cross examination, however, Dr. Stein admitted that [the Petitioner] also met most of the diagnostic criteria for an antisocial personality.

-4-

A second defense expert, Jonathan Lipman, a doctor of pharmacology with a specialty in neuropharmacology (the study of the effect of drugs on the brain), testified about the effect of anti-psychotic or neuroleptic drugs like those taken by the [Petitioner] on the brain and about these drugs' side effects, such as shaking and grimacing, indicative of tardive dyskinesia. Dr. Lipman also testified about supersensitivity psychosis, a psychosis caused by the withdrawal of anti-psychotic drugs from someone who had been taking them for some time, and noted that [the Petitioner's] history indicated he could have been suffering from such a psychosis at the time of the killing.

The State presented the testimony of two experts, Dr. John Filley, a psychiatrist at the Middle Tennessee Mental Health Institute, [MTMHI] who had examined [the Petitioner] on two occasions, and Dr. Mohammad Rahib, a psychiatrist who had examined [the Petitioner] in late 1979 and early 1980. Both men diagnosed [the Petitioner] as having an antisocial personality disorder, and Dr. Rahib stated there was little substantiation for the theory of supersensitivity psychosis. Neither believed [the Petitioner] was suffering from a mental disease or defect that met the standards of *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977).

In surrebuttal, [the Petitioner] presented Dr. Jan Mayer, a psychiatrist, who testified that the concept of supersensitivity psychosis was accepted by some members of the medical-scientific community and not by others. Dr. Patricia Corey, a psychiatrist who had examined [the Petitioner] at MTMHI in late 1979, recounted [the Petitioner's] bizarre behavior at that time and her initial diagnosis of psychosis associated with drug (amphetamines) intoxication.

*State v. Taylor*, 771 at 389-391. The Tennessee Supreme Court affirmed the Petitioner's conviction and sentence. *Id*. at 389.

## B. First Petition for Post-Conviction Relief

The Petitioner filed a petition for post-conviction relief. *Richard C. Taylor v. State*, No. 01C01-9709-CC-00384, 1999 WL 512149, at *1 (Tenn. Crim. App., at Nashville, July 21, 1999), *no Tenn. R. App. P. 11 application filed*. After conducting several evidentiary hearings in 1994 and 1995, the post-conviction court concluded that the Petitioner's attorney ("Counsel") was ineffective during both the guilt and penalty phases of the trial and granted post-conviction relief. *Id.* The post-conviction court directed that the Petitioner be evaluated for competency before the new trial began. The State appealed. On appeal, this Court

affirmed the lower court's grant of a new trial after review of the Petitioner's petition for post-conviction relief. *Id.*

## C. Second Trial

Before the Petitioner's second trial, but after he received post-conviction relief, the Petitioner filed several *pro se* motions in the trial court, including a motion requesting that he represent himself. *State v. Richard C. Taylor*, No. M2005-01941-CCA0R3-DD, 2008 WL 624913, at *1 (Tenn. Crim. App., at Nashville, Mar. 7, 2008), *no. Tenn. R. App. P. 11 application filed*. After the Petitioner's competency was determined, a second trial was held. *Id.* This Court summarized the competency evidence as follows:

> The trial court determined it could not rule on the [Petitioner's] pro se motions until after a competency hearing, and it appointed Attorneys Thomas Overton and John Appman to represent the Petitioner. The parties agreed to select an independent psychiatrist to evaluate the [Petitioner]. However, when they failed to do so, and when the trial court learned the Administrative Office of the Courts lacked funds available to pay a court witness, on May 10, 2000, the trial court directed the Forensic Services Division of the Middle Tennessee Mental Health Institute ("MTMHI") to evaluate the [Petitioner's] competency to stand trial. The court's order provided that the [Petitioner] could move the court within fifteen days for funding of an independent evaluation. On August 21, 2000, MTMHI wrote a letter informing the trial court the [Petitioner] was incompetent to stand trial, and they outlined a treatment and assessment plan. In response to this letter, the trial court scheduled a competency hearing. On November 1, 2000, MTMHI wrote a follow-up letter to the trial court stating that the [Petitioner] met the standard for commitment as a result of a mental illness. On December 13, 2000, the trial court appointed Attorney Virginia Lee Story as guardian ad litem over the [Petitioner's] affairs.

> On January 26, 2001, the trial court held a competency hearing. After hearing testimony from employees of MTMHI, the trial court found the [Petitioner] incompetent to stand trial because of a mental illness as outlined in Tennessee Code Annotated section 33-7-301(b)(1)(A). The court ordered the [Petitioner] committed to the custody of MTMHI for treatment and directed a competency re-evaluation at least every six months. On August 7, 2001, [the Petitioner]'s guardian ad litem filed a motion for judicial review on [the Petitioner]'s behalf protesting the involuntary administration of medication. On September 18, 2001, following a hearing, the trial court ordered the continued administration of medicine to the [Petitioner].

On January 10, 2002, MTMHI informed the trial court that the [Petitioner] remained incompetent to stand trial. On May 6, 2002, MTMHI wrote the court a letter stating that the [Petitioner]'s condition had improved sufficiently so that he was competent to stand trial and assist in his defense. MTMHI also informed the court that the [Petitioner] no longer met the standard for commitment. On May 23, 2002, MTMHI informed the trial court that "[t]hings have changed rather suddenly over the past four days" and that it would be a mistake to transfer the [Petitioner] to the custody of the TDOC because his "psychiatric condition had rapidly and significantly deteriorated." On July 1, 2002, MTMHI informed the court that the [Petitioner] showed improvement since the events described in the May 23rd letter and stated that the [Petitioner] was competent to stand trial and no longer met the standards for commitment at MTMHI. On July 3, 2002, the trial court granted [Petitioner]'s ex parte motion for funds for an independent psychiatric evaluation. On August 14, 2002, the trial court replaced Attorney Overton with Attorney Hershell Koger as lead counsel for the [Petitioner].

Dr. Keith A. Caruso, the expert retained by defense counsel, evaluated the [Petitioner] and concluded that he remained incompetent to stand trial due to Continuous Undifferentiated Schizophrenia. In a letter to counsel dated August 16, 2002, Dr. Caruso stated that the [Petitioner] intended to dismiss counsel and refuse taking any further medication. Dr. Caruso informed counsel that the [Petitioner] was not only incompetent to stand trial but also incompetent to make his own treatment decisions. MTMHI reported to the trial court on August 29, 2002, that the [Petitioner] remained competent to stand trial but stated that his competence was contingent upon continued treatment. MTMHI expressed concern about the [Petitioner]'s statements that he intended to refuse to take any more medication.

On September 9, 2002, the trial court continued the scheduled competency hearing until March 19, 2003. In the interim, Judge Donald P. Harris, who presided over the case after the granting of post-conviction relief, was replaced by Judge Russ Heldman. On December 30, 2002, the trial court set the competency hearing for April 1, 2003. On March 10, 2003, MTMHI updated the trial court that the [Petitioner] was competent to stand trial and assist with his defense. MTMHI again reiterated that [Petitioner]'s continued competence relied upon treatment, and it believed that the [Petitioner] could effectively be treated at the DeBerry Special Needs Facility.

On April 2 and 3, 2003, the trial court held a hearing to determine

whether the [Petitioner] was competent to stand trial. Following the testimony of the various witnesses, the trial court found the [Petitioner] competent to stand trial under the standards set forth in *State v. Blackstock*, 19 S.W.3d 200 (Tenn. 2000), and the trial court set a trial date of October 15, 2003. On April 15, 2003, the trial court denied [Petitioner]'s motion for permission to seek an interlocutory appeal to this Court. Also on April 15, 2003, the trial court relieved Attorney Story as the [Petitioner]'s guardian ad litem.

On or about May 12, 2003, the [Petitioner] filed a pro se motion requesting the termination of representation by counsel and the termination of his involuntary medication. After the [Petitioner] filed his pro se motions, his counsel filed numerous pretrial motions on his behalf. Following a hearing on [the Petitioner]'s pro se motions on June 10, 2003, the court granted the [Petitioner] permission to represent himself. Having found that the [Petitioner] knowingly and voluntarily waived his right to counsel, on June 16, 2003, the trial court entered an order relieving counsel from further representation in this capital case. Furthermore, the court struck from the record the many pretrial motions filed by counsel after May 12, 2003. The court, however, denied [Petitioner]'s request to terminate his medications. On July 15, 2003, Attorneys Koger and Appman filed a motion for a rehearing on the trial court's decision to allow the [Petitioner] to represent himself and to continue the [Petitioner]'s forced medication. On July 16, 2003, the trial court filed an order responding to counsel's motion. Initially, the court reiterated the fact that it had previously granted the [Petitioner]'s request to represent himself and stated that counsel no longer had standing to file the motions. The court then stated it would be unconstitutional for the court to force appointed counsel back on the case. The trial court also considered the issue of involuntary medication in light of the recent United States Supreme Court opinion in *Sell v. United States*, 539 U.S. 166 (2003), and thereafter concluded that the involuntary medication complied with constitutional standards. The court set the case for pretrial hearing on October 14, 2003, to address any remaining motions and to determine whether the [Petitioner] was still competent to stand trial.

On August 25, 2003, MTMHI wrote the trial judge a letter stating it was still of the opinion that the [Petitioner] remained competent to stand trial. MTMHI also informed the court of the [Petitioner]'s impending transfer to TDOC at the DeBerry Special Needs Correctional Facility on August 26, 2003. On September 12, 2003, the [Petitioner] filed a pro se motion requesting, in addition to jury instructions on premeditation, that letters he wrote after the

killing of the victim be deemed inadmissable because they were the product of torture and that a tape be barred from evidence because it was the product of [the Petitioner]'s insanity. On October 14, 2003, the trial court entered an interim order directing TDOC to continue administering medications to the [Petitioner].

The probate court in Davidson County, having been informed that the [Petitioner] was discharged by MTMHI and placed back in the custody of TDOC, appointed Attorney Edward S. Ryan as conservator for the [Petitioner] on September 11, 2003. Apparently, sometime thereafter, Attorney Ryan directed TDOC to discontinue administering the [Petitioner]'s medication. On October 14, 2003, Attorney Story filed a notice of the medications the [Petitioner] was receiving at the time. In response to this information, the trial court issued an order on October 16, 2003, stating that the "matter came before the Court via two unwarranted and inappropriate filings." The trial court commented that "it is regrettable but both Mr. Ryan and Ms. Story are interfering with the constitutional rights of [the Petitioner] . . . to represent himself." The court ordered the attorneys to stop interfering with the [Petitioner]'s rights:

> In light of these recent actions by Mr. Ryan and Ms. Story, said actions in disrespect and disregard of [Petitioner]'s election to represent himself, it is hereby ORDERED that Edward S. Ryan and Virginia Lee Story, be and hereby are, enjoined and restrained from further interference with the constitutional rights of the [Petitioner], Richard C. Taylor, applicable to this case, that is, interfering with his state and federal constitutional right to represent himself in this case by filing papers in this Court or taking action in this Court in this case, presumably in his behalf, absent prior permission to do so from this Court.

On October 14, 2003, the trial court conducted another hearing to ensure the [Petitioner]'s continued competency to stand trial and to determine whether the criteria for involuntary medication was still met. In a subsequently filed written order, the court concluded that the [Petitioner] was still competent to stand trial and that the involuntary medication should continue. Prior to the start of trial, the [Petitioner], by and through Attorney Ryan, the conservator appointed by the probate court, filed applications for extraordinary appeals in this Court and the Court of Appeals. The [Petitioner] sought review of the

interim order filed by the trial court on October 14, 2003. The Court of
Appeals denied the application stating that this Court had jurisdiction over the
matter. This Court ultimately denied the application on October 22, 2003. The
Court found the issue to be moot as the trial had already concluded, and this
Court further concluded that it did not appear the trial court so far departed
from the accepted and usual course of judicial proceedings that relief was
warranted.

*Id.* at *1-4. The Petitioner filed a motion to represent himself, which the trial court granted.
 *Id.* at 5. A trial was held on the Petitioner's charges, and the jury again convicted the
Petitioner of first degree murder.

On appeal, the Petitioner contended that he was not competent at the time of his April
2003 competency hearing. This Court disagreed. We concluded:

> The thrust of the [Petitioner's] argument is that the trial court
> improperly credited the State's witnesses, while discrediting the [Petitioner]'s
> witnesses. The [Petitioner] cites the United States Supreme Court case of
> *Medina v. California* for the proposition that "defense counsel will often have
> the best-informed view of the defendant's ability to participate in his defense."
> 505 U.S. 437, 450 (1992). However, Drs. Stout and Farooque [the State's
> witnesses] had met with the [Petitioner] over 100 times, and the trial court was
> not in error in crediting their testimony. We conclude that, given these
> credibility determinations, the [Petitioner] has not proven that the evidence
> preponderates against the trial court's decision.

The Petitioner also contended that he was not competent to waive his right to counsel.
*Id.* at *20. We agreed, concluding "the [Petitioner] is entitled to a new trial based on the
inadequacy of the counsel waiver colloquy. We are not convinced that '[t]he public
conscience [is] satisfied that fairness dominat[ed] the administration of justice' in this case.
*State v. Coleman*, 519 S.W.2d 581, 583 (Tenn. 1975) (quoting *Adams v. United States ex. rel
McCann*, 317 U.S. 269, 279 (1942))." Accordingly, we reversed the case and remanded it
for a new trial.

### D. Guilty Plea

After we reversed the case and remanded it for a new trial, on June 3, 2008, the
Petitioner pled guilty to first degree murder. The trial court sentenced the Petitioner to serve
a life sentence. A transcript of the guilty plea is not included in the record. In the record is
only the judgment of conviction reflecting that the Petitioner pled guilty and ordered to serve

a life sentence. The "Special Conditions" section of the judgment of conviction shows that the trial court handwrote, "Defendant waives all rights to appeal and all post-conviction rights."

## E. Current Post-Conviction Petition

On November 24, 2010, the Petitioner filed a *pro se* petition for post-conviction relief. In the petition, he contended, among other things, that the trial court erred when it accepted his guilty plea without a mental evaluation or hearing. He further contended that he had received the ineffective assistance of counsel at his guilty plea hearing because his counsel did not seek a mental evaluation or competency hearing.

On January 18, 2011, the trial court appointed Erin Walker to represent the Petitioner for his post-conviction petition. Walker sought permission to withdraw, and the trial court appointed the Petitioner new counsel, David Christensen. On February 11, 2011, the Petitioner filed a *pro se* motion asking to proceed *pro se*, relieve appointed counsel, and request a mental evaluation. On February 14, 2011, the trial court denied this motion by order. The order stated:

> This Court originally appointed Ms. Erin Walker as counsel for [the Petitioner]. Subsequently, however, Ms. Walker asked to withdraw and the Court granted her request and appointed substitute counsel, Mr. David Christensen. Now upon consideration of the Petitioner's request to proceed *pro se*, the Court finds that he reserves that right, has been involved in numerous legal proceedings in the past, representing himself *pro se,* as well as having counsel of record, and has made said request[ ] knowingly and voluntarily. Upon consideration of the request, the Court strikes its earlier Order finding that Mr. David Christensen shall be assigned as counsel for the Petitioner and will allow the Petitioner to proceed *pro se* with regard to this Post-Conviction Relief Petition.

> The Court finds that the Petitioner's request for a mental evaluation is an appropriate request and shall be set at the Court's earliest convenience. The Petitioner will be notified of the date for that hearing by separate order.

On April 11, 2011, the trial court ordered that a video hearing be conducted on May 9, 2011, to determine the Petitioner's competency.

On May 6, 2011, the State filed a motion to dismiss the Petitioner's post-conviction petition without a hearing. The State argued in its motion that the Petitioner's petition was

filed beyond the statute of limitations. The State further asserted that the Petitioner waived his right to post-conviction relief as part of his guilty plea, as evidenced by the judgment of conviction. Finally, the State contended that the colloquy during the guilty plea hearing[1] showed that the Petitioner understood the nature of his guilty plea.

The State attached to its motion several documents. First, the State attached a copy of the judgment of conviction, reflecting the Petitioner's waiver of his right to appeal and right to file a post-conviction petition. Next, the State attached a copy of the petition for waiver of trial and jury and request for acceptance of a plea of guilty, which was signed by both the Petitioner and his counsel of record. The State also attached a copy of the negotiated plea agreement signed by the Petitioner, his counsel of record, and the State's attorney. That document also reflected that, as part of the guilty plea, the Petitioner agreed to waive his right to appeal and his right to seek post-conviction relief. The final document attached by the State was a "Stipulation," signed by the Petitioner, his counsel of record, and the State's attorney. That Stipulation read:

> Comes the defendant, Richard C. Taylor, in support of his/her plea in this case, and states that he wishes to stipulate that a factual basis for his/her plea does exist. I have discussed the necessity for a factual basis for my plea with my counsel, and I understand that I could insist that the prosecution fully recite that factual basis in open court. I understand the elements of the offense to which I am pleading; and I fully understand what the prosecution would have to prove if this case were to go to trial. I also aver that I understand the evidence the State would introduce if this case had gone to trial, and counsel has explained – and I understand – the applicable law in relation to the state's evidence. I also understand the necessity of a "factual basis" for my plea to be considered knowing and voluntary. It is my wish, however, to forgo that recitation and enter this stipulation that there is a factual basis for my plea to each offense to which I am pleading guilty. I waive any objection (if any) that could be raised to this plea in the future based on the factual basis for my plea not being fully explicated in open court. I am making this stipulation voluntarily and knowingly. I believe it is my constitutional right to make this waiver, and I believe it is in my best interest to do so.

On June 20, 2011, the trial court held a hearing on the Petitioner's post-conviction petition and the State's motion to dismiss. The Petitioner represented himself at the hearing. The State's psychologist, who was not present at the hearing, submitted the Petitioner's past mental health records. Another psychologist, who had evaluated the Petitioner for the

---

[1] Again, the guilty plea transcript is not included in the record on appeal.

defense, also submitted his mental health records regarding the Petitioner.

The State then argued that the Petitioner's petition was filed beyond the applicable statute of limitations. It further argued that the Petitioner had waived his right to post-conviction relief as part of the guilty plea agreement. The Petitioner countered that he had been diagnosed with "chronic undifferentiated schizophrenia and psychosis" and that his mental illness should toll the statute of limitations. He cited case law in support of his contention. The Petitioner asserted that, at the time he entered his guilty plea and agreed to waive his rights to post-conviction relief, he was suffering from a mental illness.

The post-conviction court stated:

> The Court doesn't put too much stock in the District Attorney's representation to the Court that [the Petitioner] waived any rights to appeal or filings of post-conviction relief, primarily because, again, if [the Petitioner] is going to state that he was mentally incompetent at the time, even if it was put on the record that he understood what he was doing, if it can be shown that he was mentally incompetent at the time, then that waiver is not sufficient for any purpose . . . .
>
> The Court also agrees, obviously, with the State that he has one year in which to file his post-conviction relief, alleging the bases that he's alleging now. That one year has long since elapsed, but [the Petitioner] is correct; if, in fact, he was incompetent for a significant period of that one year, then . . . that statute can be tolled, and the Court would have to take evidence as to when he regained his competence, if ever, and how much longer he should be given in which to file his [post-conviction petition], and that's all a matter of fact that would need to be developed by the evidence.
>
> So the State's Motion to Dismiss . . . would not properly be granted at this time; however, the impetus is still on [the Petitioner] to show to the Court that there is enough of a basis for the court to believe that, in fact, he was incompetent at the time of the entry of this plea, or a significant portion of the year thereafter, to go forward with . . . his [post conviction petition] at all. . . .
>
> If he can get an affidavit from a treating physician that says that that physician's opinion of [the Petitioner] is that he was incompetent at the time of his plea, and for a significant portion of the year thereafter, then I think that's enough to defeat the State's Motion to Dismiss and proceed then

factually and allow the Court to hear more evidence as to whether it's properly before the Court or not. But . . . not to be too redundant, but the main impetus still, however, is on [the Petitioner] to at least give the Court enough threshold evidence to believe that that is a true issue that must be determined.

The post-conviction court then specifically explained his ruling to the Petitioner, saying:

[E]ven if you gave me 3,000 pages of records, I'm not a [psychiatrist] or a doctor, I'm not going to be able to sift through that. What I'm looking for, basically to get your motion properly before the court, is an affidavit from some doctor that has reviewed the records or treated you, that is willing to state on the record, through affidavit, that at the time of your plea, and for a significant portion of time thereafter, you were [incompetent].

. . . .

If you can get me that, then the Court will allow this [post-conviction petition] to go forward. If you can't, then I'm going to say that you haven't reached a threshold question and I'm going to dismiss it.

The Petitioner asked for ninety days in which to get such an affidavit, and the post-conviction court granted his request. After the conclusion of the hearing, on July 6, 2011, the court issued an order requiring the Petitioner to provide an affidavit from a psychologist or psychiatrist evidencing that the Petitioner was incompetent on the date of the plea.

On September 6, 2011, the post-conviction court filed an order dismissing the Petitioner's petition for post-conviction relief. The order stated:

After hearing proof and considering the entire record, the Court took the State's Motion to Dismiss the Petition and the [P]etitioner's Petition under advisement, ordering the [P]etitioner to file an affidavit from a psychologist or psychiatrist evidencing that the [P]etitioner was incompetent on the date he entered his plea. The court granted the [P]etitioner 90 days to provide said affidavit.

On August 30, 2011, the [P]eititoner had failed to comply with the Court's Order to file said affidavit, and consequently, the Court dismissed the Petition for Post-Conviction Relief.

On October 13, 2011, the Petitioner filed a motion to make his medical records an

-14-

exhibit to the record, and the post-conviction court granted that motion. On March 28, and April 2, 2012, the Petitioner filed motions to amend his petition for post-conviction relief. On April 9, 2012, the post-conviction court denied those motions on the basis that it had dismissed the Petition for post-conviction relief.

On April 16, 2012, the Petitioner filed a notice of appeal. On April 18, 2012, the Petitioner filed a motion to withdraw his notice of appeal. On November 1, 2012, the Petitioner filed a second notice of appeal. In it, he stated, "due to [P]etitioner's chronic schizophrenia and present psychiatric distress [he] withdrew [his original notice of appeal] hours after writing Court of Appeals to advise it that Petitioner was experiencing incapacitating mental illness; days later Petitioner was transfer[r]ed for mental treatment."

## II. Analysis

On appeal, the Petitioner contends the post-conviction court failed to ascertain his competency to proceed with his post-conviction petition even though it asserted that a mental examination was appropriate. The Petitioner also raises the issues he raised in his original petition for post-conviction relief. The State counters first that the Petitioner's appeal should be dismissed because his notice of appeal was filed untimely and the interest of justice does not warrant a waiver of the notice of appeal requirement. The State further asserts that the post-conviction court properly dismissed the Petitioner's post-conviction petition because the Petitioner failed to show that the statute of limitations should be tolled.

### A. Notice of Appeal

Initially, we address whether the Petitioner filed an untimely notice of appeal. The trial court denied the Petitioner's petition for post-conviction relief on September 6, 2011. It is not clear whether the Petitioner had notice of this in that he filed motions to amend his post-conviction petition in March and April of 2012. The trial court denied those motions on April 9, 2012. The Petitioner filed his first notice of appeal on April 16, only to withdraw it on April 18. The Petitioner then filed another notice of appeal on November 1, 2012, citing his mental health again as a cause for the original withdrawal and subsequent delay before filing for appeal.

"[I]n all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R.App. P. 4(a). "In determining whether waiver is appropriate, this Court will consider the nature of the issues presented for review, the reasons for and the length of the delay in seeking relief, and any other relevant factors presented in the particular case." *State v. Markettus L. Broyld*, No. M2005-00299-CCA-R3-CO, 2005 WL 3543415, at *1 (Tenn. Crim. App., at Nashville, Dec.

27, 2005) (citing *Michelle Pierre Hill v. State*, No. 01C01-9506-CC-00175, 1996 WL 63950, at *1 (Tenn. Crim. App., at Nashville, Feb. 13, 1996)), *no Tenn. R. App. P. 11 application filed*.

In the present case, considering the procedural history, the previous testimony regarding the Petitioner's mental state, and the trial court's rulings, we conclude that the interest of justice is served by waiver of the untimely filing of the Petitioner's notice of appeal. Accordingly, we will address the Petitioner's issue on its merits.

## B. Statute of Limitations

The threshold issue before us is whether the trial court erred when it determined that the Petitioner's appeal should be dismissed based upon it being filed beyond the applicable statute of limitations. As part of that inquiry, we must determine whether due process required tolling the statute.

The burden in a post-conviction proceeding is on the Petitioner to prove his allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012); *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). The Post-Conviction Procedure Act allows for the filing of only one petition attacking a single judgment, which must be filed within one year of the final action by the highest state appellate court to which an appeal was made or, if no appeal is taken, within one year of the trial court's judgment becoming final. T.C.A. § 40-30-102(a), (c) (2012). Principles of due process may allow tolling of the statute of limitations in limited circumstances. *See Burford v. State*, 845 S.W.2d 204, 208 (Tenn. 1992) ("[D]ue process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner."). "[A] petitioner who is mentally incompetent is denied an opportunity to raise a claim in a meaningful manner unless the statute of limitations is tolled during the period of mental incompetence." *Seals v. State*, 23 S.W.3d 272, 279 (Tenn. 2000).

With regard to claimed mental incompetence, our Supreme Court has provided the following regarding a petitioner's pleading requirements:

> [T]o make a prima facie showing of incompetence requiring tolling of the limitations period, a post-conviction petition must include specific factual allegations that demonstrate the petitioner's inability to manage his personal affairs or understand his legal rights and liabilities. Unsupported, conclusory, or general allegations of mental illness will not be sufficient to require tolling

and prevent summary dismissal under Tenn. Code Ann. § 40-30-206(b) & (f). The required prima facie showing may be satisfied by attaching to the petition affidavits, depositions, medical reports, or other credible evidence that contain specific factual allegations showing the petitioner's incompetence. While affidavits and depositions of mental health professionals may be utilized, they are not essential, and a petitioner may rely upon affidavits and depositions from family members, prison officials, attorneys, or any other person who has knowledge of facts that demonstrate either the petitioner's inability to manage his personal affairs or the petitioner's inability to understand his legal rights and liabilities. Even if a petitioner satisfies the prima facie showing, at the hearing the petitioner bears the burden of proving by clear and convincing evidence that the statute of limitations should be tolled for incompetence, and that as a result of the tolling, the petition is timely. Unless this burden is satisfied, the petition should be dismissed as time-barred.

*State v. Nix*, 40 S.W.3d 459, 464-65 (Tenn. 2001) (citations omitted).

In this case, the post-conviction court clearly informed the Petitioner, who fully understood, that he needed to supplement the record with an affidavit in support of his contention that he was mentally incompetent at the time he entered the guilty plea. The Petitioner asked for and was granted ninety days in which to so do, but he never submitted an affidavit. After the post-conviction court dismissed his petition, the Petitioner filed a motion to supplement the record with medical records from the Tennessee Department of Correction. Many of these records are not from the time period in which he pled guilty. In any event, the Petitioner did not comply with the post-conviction court's order, one which, by all accounts, he fully understood. We conclude that the post-conviction court did not err when it determined that due process did not require tolling the statute of limitations. The Petitioner is not entitled to relief on this issue.

### III. Conclusion

Based on the record and aforementioned authorities, we conclude that the post-conviction court did not err when it dismissed the Petitioner's petition for post-conviction relief. We, therefore, affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

-17-